C-489-843
Remand Redetermination
Slip Op. 22-13
Court No. 21-00050
**Public Document**
E&C/OII:  JAG

### FINAL RESULTS OF REDETERMINATION
### PURSUANT TO COURT REMAND
**Prestressed Concrete Steel Wire Strand from the Republic of Turkey**
*Celik Halat ve Tel Sanayi A.S. v. United States*,
**Court No. 21-00050, Slip Op. 22-13 (CIT February 15, 2022)**

## I.    SUMMARY

The Department of Commerce (Commerce) prepared these final results of

redetermination pursuant to the opinion and remand order of the U.S. Court of International

Trade (the Court) issued in *Celik Halat ve Tel Sanayi A.S. v. United States*, Slip Op. 22-13, Court

No. 21-00050 (CIT 2022) (*Remand Order*).  This action arises out of the final determination in

the countervailing duty (CVD) investigation of prestressed concrete steel wire strand (PC Strand)

from the Republic of Turkey (Turkey).[1]  Celik Halat ve Tel Sanayi A.S. (Celik Halat)[2] was one

of the two mandatory respondents in the underlying CVD investigation, the period of

investigation (POI) of which is January 1, 2019, through December 31, 2019.

The Court remanded the *Final Determination* to Commerce to determine a new estimated

net subsidy rate for Celik Halat without relying on section 776 of Tariff Act of 1930, as amended

(the Act), with respect to the filing of Celik Halat's response to section III of the initial CVD

questionnaire.  After reopening the record for Celik Halat to submit its response to section III of

the initial CVD questionnaire, Commerce recalculated Celik Halat's estimated net subsidy rate,

---

[1] *See Prestressed Concrete Steel Wire Strand from the Republic of Turkey:  Final Affirmative Countervailing Duty Determination and Final Negative Critical Circumstances Determination*, 85 FR 80005 (December 11, 2020) (*Final Determination*), and accompanying Issues and Decision Memorandum (IDM).
[2] We found, and continue to find, the following companies to be cross-owned with Celik Halat:  Dogan Sirketler Grubu Holding A.S. and Adilbey Holding A.S.  *See Final Determination*, 85 FR at 80006, fn. 8.

per the Court's remand order.  As a result, Celik Halat's revised estimated net subsidy rate is

2.96 percent.  Moreover, as a result of Commerce's recalculation of the estimated net

countervailable subsidy rate for Celik Halat, the estimated net countervailable subsidy rate

applied to all other producers/exporters is 16.87 percent.[3]

## II.    BACKGROUND

Commerce published the *Final Determination* on December 11, 2020.[4]  As discussed in

the *Final Determination*, Commerce determined that, because Celik Halat withheld information

requested by Commerce, failed to provide such information by the established deadline, and

significantly impeded the proceeding, the use of facts available was warranted pursuant to

section 776(a) of the Act.  Additionally, Commerce found that Celik Halat failed to cooperate to

the best of its ability to comply with Commerce's request for information within the meaning of

section 776(b)(1) of the Act because Celik Halat filed its response to section III of the initial

CVD questionnaire after the established deadline and without requesting an extension of the

deadline.[5]  Consequently, Commerce assigned Celik Halat a final net subsidy rate of 158.44

percent, in accordance with section with section 776(b) of the Act.[6]  Pursuant to section

705(c)(5)(A)(i) of the Act, Commerce assigned a final net subsidy rate of 94.61 percent as the

"all-others" rate, based on a simple average of the rates determined for Celik Halat and the other

mandatory respondent.

---

[3] *See* section 735(c)(5)(A) of the Act; *see also Prestressed Concrete Steel Wire from the Republic of Turkey: Preliminary Affirmative Countervailing Duty Determination, Preliminary Affirmative Critical Circumstances Determination, in Part*, 85 FR 59287 (September 21, 2020) (*Preliminary Determination*), and accompanying Preliminary Decision Memorandum (PDM) at 6-7 (explaining method for determining rate applied to companies not selected for individual examination), unchanged in the *Final Determination*; and section "VI.  FINAL RESULTS OF REDETERMINATION," below.
[4] *See Final Determination*.
[5] *See Final Determination* IDM at Comment 6.
[6] Celik Halat's net subsidy rate also included a New Subsidy Allegation program calculated based on Celik Halat's questionnaire responses regarding the New Subsidy Allegations without the application of section 776 of the Act.

In its February 15, 2022 opinion, the Court remanded the *Final Determination* to Commerce, concluding that certain findings of fact on which Commerce relied, and which were essential to that determination, were not supported by substantial evidence on the record and that Commerce abused its discretion when rejecting Celik Halat's questionnaire response.[7]  The Court, therefore, remanded the *Final Determination* to Commerce for a determination that does not resort to section 776 of the Act with respect to the filing of Celik Halat's response to section III of the initial CVD questionnaire.[8]

On February 18, 2022, we reopened the administrative record to permit, among other things:  (1) Celik Halat to file its response to section III of the CVD questionnaire; and (2) other interested parties with the opportunity to submit factual information to rebut, clarify, or correct this information.[9]  On February 21, 2022, Celik Halat filed its response to section III of the CVD questionnaire.[10]  On February 25, 2022, the petitioners[11] submitted comments on Celik Halat's section III questionnaire response.[12]  On February 28, 2022, Commerce issued a supplemental questionnaire to Celik Halat requesting that Celik Halat provide information it failed to provide in its initial questionnaire response that Commerce required to calculate subsidy rates for certain reported subsidy programs, and, on March 7, 2022, Celik Halat submitted its supplemental questionnaire response.[13]  On March 8, 2022, the petitioners submitted comments on Celik

---

[7] *See Remand Order* at 12-37.

[8] *Id.* at 37.

[9] *See* Commerce's Letter, "Remand Redetermination in the Countervailing Duty Investigation of Prestressed Concrete Steel Wire Strand from the Republic of Turkey," dated February 18, 2022.

[10] *See* Celik Halat's Letter, "Resubmission of CVD Questionnaire Response of Celik Halat ve Tel Sanayi A.S.," dated February 21, 2022 (Celik Halat's IQR).

[11] The petitioners are Insteel Wire Products Company, Sumiden Wire Products Corporation, and Wire Mesh Corporation.

[12] *See* Petitioners' Letter, "Petitioners' Comments on Celik Halat ve Tel Sanayi A.S.'s Resubmitted Section III Questionnaire Response," dated February 25, 2022.

[13] *See* Celik Halat's Letter, "Resubmission of CVD Questionnaire Response of Celik Halat ve Tel Sanayi A.S.," dated March 7, 2022 (Celik Halat's SQR).

Halat's supplemental questionnaire response.[14]  On March 11, 2022, Commerce issued a questionnaire in lieu of conducting an on-site verification to Celik Halat,[15] and, on March 16, 2022, Celik Halat submitted its response to this questionnaire.[16]

## III.   ANALYSIS

In accordance with the Court's instructions, we determined a net subsidy rate for Celik Halat without relying on section 776 of the Act with respect to Celik Halat's initial filing of a response to section III of the initial CVD questionnaire.  However, in our redetermination on remand, Commerce relied on section 776 of the Act, including adverse facts available (AFA), with respect to certain findings, as discussed below, because Celik Halat failed to act to the best of its ability to provide certain necessary information in both its initial and supplemental questionnaire responses.  We calculated a new net subsidy rate of 2.96 percent, as discussed below.

### A.  Legal Standard

Section 776(a) of the Act provides that Commerce shall, subject to section 782(d) of the Act, select from among the "facts otherwise available" if necessary information is not on the record or an interested party or any other person:  (A) withholds information that has been requested; (B) fails to provide information within the deadlines established, or in the form and manner requested by Commerce, subject to subsections (c)(1) and (e) of section 782 of the Act; (C) significantly impedes a proceeding; or (D) provides information that cannot be verified as provided by section 782(i) of the Act.

---

[14] *See* Petitioners' Letter, "Petitioners' Comments on Celik Halat ve Tel Sanayi A.S.'s Resubmitted and Supplemental Questionnaire Responses," dated March 8, 2022.
[15] *See* Commerce's Letter, "In Lieu of Performing an On-Site Verification Questionnaire," dated March 11, 2022 (Commerce's In Lieu of On-Site Verification Letter).
[16] *See* Celik Halat's Letter, "CVD Verification Questionnaire Response of Celik Halat ve Tel Sanayi A.S.," dated March 16, 2022 (Celik Halat's Verification QR).

Section 776(b) of the Act further provides that Commerce may use an adverse inference in selecting from among the facts otherwise available when a party fails to cooperate by not acting to the best of its ability to comply with a request for information.  Further, section 776(b)(2) of the Act states that an adverse inference may include reliance on information derived from the petition, the final determination from the investigation, a previous administrative review, or other information placed on the record.  When selecting an AFA rate from among the possible sources of information, Commerce's practice is to ensure that the rate is sufficiently adverse "as to effectuate the statutory purposes of the adverse facts available rule to induce respondents to provide Commerce with complete and accurate information in a timely manner."[17]  Commerce's practice also ensures "that the party does not obtain a more favorable result by failing to cooperate than if it had cooperated fully."[18]

Section 776(c) of the Act provides that, when Commerce relies on secondary information rather than on information obtained in the course of an investigation or review, it shall, to the extent practicable, corroborate that information from independent sources that are reasonably at its disposal.  Secondary information is "information derived from the petition that gave rise to the investigation or review, the final determination concerning the subject merchandise, or any previous review under section 751 concerning the subject merchandise."[19]  It is Commerce's practice to consider information to be corroborated if it has probative value.[20]  In analyzing whether information has probative value, it is Commerce's practice to examine the reliability and

---

[17] *See, e.g., Drill Pipe from the People's Republic of China:  Final Affirmative Countervailing Duty Determination, Final Affirmative Critical Circumstances Determination*, 76 FR 1971 (January 11, 2011); and *Notice of Final Determination of Sales at Less Than Fair Value:  Static Random Access Memory Semiconductors from Taiwan*, 63 FR 8909, 8932 (February 23, 1998).
[18] *See* Statement of Administrative Action accompanying the Uruguay Round Agreements Act, H.R. Doc. 103-316, vol. 1 (1994) (SAA) at 870.
[19] *See, e.g.*, SAA at 870.
[20] *Id*.

relevance of the information to be used.[21]  However, the SAA emphasizes that Commerce need

not prove that the selected facts available are the best alternative information.[22]

Under section 776(d) of the Act, Commerce may use a countervailable subsidy rate

applied for the same or similar program in a CVD proceeding involving the same country, or, if

there is no same or similar program, use a CVD rate for a subsidy program from a proceeding

that Commerce considers reasonable to use, including the highest of such rates.  Additionally,

when selecting an AFA rate, Commerce is not required for purposes of section 776(c) of the Act,

or any other purpose, to estimate what the countervailable subsidy rate would have been if the

non-cooperating interested party had cooperated or to demonstrate that the countervailable

subsidy rate reflects an "alleged commercial reality" of the interested party.[23]  For purposes of

this remand redetermination, we are applying AFA to Celik Halat for the General Investment

Incentive Scheme (GIIS) Customs Duty Exemption program for which Celik Halat did not

cooperate to the best of its ability, as discussed below.

**B.  Use of AFA**

We find that necessary information is not available on the record and that Celik Halat

failed to provide the requested necessary information that would allow us to assess the benefit

conferred under the GIIS Customs Duty Exemption program, which is part of the Investment

Encouragement Program (IEP).  Thus, pursuant to sections 776(a)(1) and (a)(2)(A) of the Act,

we determine the benefit for this program by applying facts available.  Moreover, we determine

that the application of AFA is warranted regarding the benefit conferred under the GIIS Customs

Duty Exemption program for Celik Halat, pursuant to section 776(b) of the Act, because Celik

---

[21] *Id*. at 869.
[22] *Id*. at 869-70.
[23] *See* section 776(d)(3) of the Act.

Halat failed to act to the best of its ability by not providing a complete initial questionnaire response for this program[24] and again failing to provide this information, despite having this information in its possession, in its supplemental questionnaire response when we requested this information for a second time.[25]  Specifically, as discussed in detail below at the "GIIS Customs Duty Exemption" section, Celik Halat failed to provide either the benefit conferred by the GIIS Customs Duty Exemption or the information necessary for Commerce to calculate the benefit (*e.g.*, the rate of the customs duty applicable to the equipment imported by Celik Halat under the relevant investment incentive certificate (IIC)).  Thus, we find that Celik Halat did not cooperate to the best of its ability to comply with Commerce's requests for information.  Accordingly, we determine that the use of an adverse inference in selecting from among the facts otherwise available is warranted to ensure that Celik Halat does not obtain a more favorable result by failing to cooperate than if it had complied with our requests for information.

The Government of Turkey (GOT) provided necessary information for financial contribution and specificity.  In this remand redetermination, for the GIIS Customs Duty Exemption, we continue to find this program provides a financial contribution within the meaning of section 771(5)(D)(ii) of the Act in the form of revenue forgone by the GOT.[26] Because the actual recipients are limited in number, we determine that this program is specific in accordance with section 771(5A)(D)(i) of the Act.[27]

---

[24] *See* Celik Halat's IQR at 23.
[25] *See* Celik Halat's SQR at 2-3 and Exhibit 26.
[26] *See* GOT's Letter, "Response of the Government of Turkey Initial Questionnaire in Countervailing Duty Investigation on Prestressed Concrete Steel Wire from the Republic of Turkey," dated July 27, 2020 (GOT's July 27, 2020 IQR) at 84.
[27] *Id*. at 88.

### C.  Selection of the AFA Rate

When selecting an AFA rate, section 776(d) of the Act provides that Commerce may use any countervailable subsidy rate applied for the same or similar program in a CVD proceeding involving the same country, or, if there is no same or similar program, use a countervailable subsidy rate for a subsidy program from a proceeding that the administering authority considers reasonable to use, including the highest of such rates.[28]  Accordingly, when selecting an AFA rate, if we have cooperating respondents in the investigation, we first determine if there is an identical program in the instant investigation and use the highest calculated rate for the identical program.  If there is no identical program that resulted in a subsidy rate above *de minimis* for a cooperating respondent in the investigation, we then determine if Commerce countervailed an identical program in another CVD proceeding involving the same country and apply the highest calculated above-*de minimis* rate for the identical program.[29]  If no such rate exists, we then determine if there is a similar/comparable program (based on the treatment of the benefit) countervailed in any CVD proceeding involving the same country and apply the highest calculated above-*de minimis* rate for the similar/comparable program.  Finally, where no such rate is available, we apply the highest calculated above-*de minimis* rate from any non-company specific program in a CVD case involving the same country that the company's industry could conceivably use.[30]

---

[28] *See Certain Frozen Warmwater Shrimp from the People's Republic of China:  Final Affirmative Countervailing Duty Determination*, 78 FR 50391 (August 19, 2013) (*Shrimp from China*), and accompanying IDM at 12-14; *see also Essar Steel, Ltd. v. United States*, 753 F.3d 1368, 1373-74 (Fed. Cir. 2014) (upholding use of a "hierarchical methodology for selecting an AFA rate.").

[29] For purposes of selecting AFA program rates, we normally consider rates less than 0.5 percent to be *de minimis*. *See, e.g., Pre-Stressed Concrete Steel Wire Strand from the People's Republic of China:  Final Affirmative Countervailing Duty Determination*, 75 FR 28557 (May 21, 2010), and accompanying IDM at "E. Various Grant Programs:  1. Grant Under the Tertiary Technological Renovation Grants for Discounts Program" and "2. Grant Under the Elimination of Backward Production Capacity Award Fund."

[30] *See Shrimp from China* IDM at 13-14.

Commerce's methodology is consistent with section 776(d)(1)(A) of the Act.  Section 776(d)(1)(A) of the Act states that, when applying an adverse inference in selecting from the facts otherwise available, Commerce may:  (i) use a countervailable subsidy rate applied for the same or similar program in a CVD proceeding involving the same country; or (ii) if there is no same or similar program, use a countervailable subsidy for a subsidy rate from a proceeding that Commerce considers reasonable to use.  Thus, section 776(d)(1)(A) of the Act expressly allows for Commerce's existing practice of using an AFA hierarchy in selecting a rate "among the facts otherwise available" in CVD cases, should the facts warrant such a selection.

Section 776(d)(2) of the Act authorizes Commerce to rely on the highest prior rate under certain circumstances.  In deriving an AFA rate under section 776(d)(1)(A) of the Act, as described above, the provision states that Commerce "may apply any of the countervailable subsidy rates or dumping margins specified under that paragraph, including the highest such rate or margin, based on the evaluation by the administering authority of the situation that resulted in the administering authority using an adverse inference in selecting among the facts otherwise available."  No legislative history accompanied this provision.  Accordingly, Commerce is left to interpret this "evaluation by the administering authority of the situation" language in light of existing agency practice and the structure and provisions of section 776(d) of the Act itself.  We find that the Act anticipates a two-step process for determining an appropriate AFA rate in CVD cases:  (1) Commerce may apply its hierarchy methodology; and (2) Commerce may apply the highest rate derived from this hierarchy to a respondent, should it choose to apply that hierarchy in the first place, unless, after an evaluation of the situation that resulted in the use of AFA,

Commerce determines that the situation warrants a rate different than the rate derived from the hierarchy be applied.[31]

In applying the AFA rate provision, it is well established that, when selecting the rate from among possible sources, Commerce seeks to use a rate that is sufficiently adverse to effectuate the statutory purpose of section 776(b) of the Act to induce respondents to provide Commerce with complete and accurate information in a timely manner.  This approach ensures "that the party does not obtain a more favorable result by failing to cooperate than if it had cooperated fully."[32]  Further, "in the case of an uncooperative respondent, Commerce is in the best position, based on its expert knowledge of the market and the individual respondent, to select adverse facts that will create the proper deterrent to non-cooperation with its investigations and assure a reasonable margin."[33]  It is pursuant to this knowledge and experience that Commerce has implemented its AFA hierarchy in CVD cases to select an appropriate AFA rate.[34]

In applying its AFA hierarchy in CVD investigations, Commerce's goal is as follows:  in the absence of necessary information from cooperative respondents, Commerce is seeking to find

---

[31] This process differs from antidumping duty (AD) proceedings for which no hierarchy applies under section 776(d)(1)(B) of the Act.  Under that provision, "any dumping margin from any segment of the proceeding under the applicable {AD} order" may be applied, which suggests an adverse rate could be derived from different available margins, given the facts on the record.

[32] *See* SAA at 870; *see also Essar Steel Ltd. v. United States*, 678 F.3d 1268, 1276 (Fed. Cir. 2012) (finding that "{t}he purpose of the adverse facts statute is 'to provide respondents with an incentive to cooperate' with Commerce's investigation, not to impose punitive damages.") (quoting *F. Lii De Cecco Di Filippo Fara S. Martino S.p.A. v. United States*, 216 F.3d 1027, 1032 (Fed. Cir. 2000) (*De Cecco*)).

[33] *See De Cecco*, 216 F.3d at 1032.

[34] Commerce has adopted a practice of applying its hierarchy in CVD cases.  *See, e.g.*, *Finished Carbon Steel Flanges from India:  Final Affirmative Countervailing Duty Determination*, 82 FR 29479 (June 29, 2017), and accompanying IDM at Comment 4 (applying the AFA hierarchical methodology within the context of a CVD investigation); and *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China:  Final Results of Countervailing Duty Administrative Review; 2012*, 80 FR 41003 (July 14, 2015), and accompanying IDM at 11-15 (applying the AFA hierarchical methodology within the context of a CVD administrative review).  However, depending on the type of program, Commerce may not always apply its AFA hierarchy.  *See also, e.g., Certain Uncoated Paper from Indonesia:  Final Affirmative Countervailing Duty Determination*, 81 FR 3104 (January 20, 2016), and accompanying IDM at 7-8 (applying, outside of the AFA hierarchical context, the highest combined standard income tax rate for corporations in Indonesia).

a rate that is a relevant indicator of how much the government of the country under investigation is likely to subsidize the industry at issue, through the program at issue, while inducing cooperation. Accordingly, in sum, the three factors that Commerce takes into account in selecting a rate are: (1) the need to induce cooperation; (2) the relevance of a rate to the industry in the country under investigation (*i.e.*, can the industry use the program from which the rate is derived); and (3) the relevance of a rate to a particular program, though not necessarily in that order of importance.

Furthermore, the hierarchy (as well as section 776(d)(1) of the Act) recognizes that there may be a "pool" of available rates that Commerce can rely upon for purposes of identifying an AFA rate for a particular program. In investigations for example, this "pool" of rates could include the rates for the same or similar programs used in either that same investigation or prior CVD proceedings for that same country. Of those rates, the hierarchy provides a general order of preference to achieve the goal identified above. The hierarchy, therefore, does not focus on identifying the highest possible rate that could be applied from among that "pool" of rates; rather, it adopts the factors identified above of inducement, relevancy to the industry, and relevancy to the particular program.

Under the first step of Commerce's investigation hierarchy, Commerce applies the highest non-zero rate calculated for a cooperating company for the identical program in the investigation. Under this step, we will even use a *de minimis* rate as AFA if that is the highest rate calculated for another cooperating respondent in the same industry for the same program. However, if there is no identical program match within the investigation, or if the rate is zero, then Commerce will shift to the second step of its investigation hierarchy and either apply the highest non-*de minimis* rate calculated for a cooperating company in another CVD proceeding

involving the same country for the identical program or, if the identical program is not available, for a similar program.  This step focuses on the amount of subsidies that the government has provided in the past under the investigated program.  The assumption under this step is that the non-cooperating respondent under investigation uses the identical program at the highest above *de minimis* rate of any other company using the identical program.

Finally, if no such rate exists, under the third step of Commerce's investigation hierarchy, Commerce applies the highest rate calculated for a cooperating company from any non-company-specific program that the industry subject to the investigation could have used for the production or exportation of subject merchandise.[35]

In all three steps of Commerce's AFA investigation hierarchy, if Commerce were to choose low AFA rates consistently, the result could be a negative determination with no order (or a company-specific exclusion from an order) and a lost opportunity to correct future subsidized behavior.  In other words, the "reward" for a lack of cooperation would be no order discipline in the future for all or some producers and exporters.  Thus, in selecting the highest rate available in each step of Commerce's investigation AFA hierarchy (which is different from selecting the highest possible rate in the "pool" of all available rates), Commerce strikes a balance between the three necessary variables:  inducement, industry relevancy, and program relevancy.[36]

---

[35] In an investigation, unlike an administrative review, Commerce is just beginning to achieve an understanding of how the industry under investigation uses subsidies.  Commerce may have no prior understanding of the industry and no final calculated and verified rates for the industry.

[36] It is significant that all interested parties, since at least 2007, that choose not to provide requested information have been put on notice that Commerce, in the application of facts available with an adverse inference, may apply its hierarchy methodology and select the highest rate in accordance with that hierarchy.  *See, e.g., Coated Free Sheet Paper from the People's Republic of China:  Final Affirmative Countervailing Duty Determination*, 72 FR 60645 (October 25, 2007), and accompanying IDM at 2 ("As AFA in the instant case, {Commerce} is relying on the highest calculated final subsidy rates for income taxes, {value added tax} and policy lending programs of the other producer/exporter in this investigation, Gold East Paper (Jiangsu) Co., Ltd. (GE).  GE did not receive any countervailable grants, so for all grant programs, we are applying the highest subsidy rate for any program otherwise listed ... .").  Therefore, when an interested party is making a decision as to whether or not to cooperate and respond to a request for information by Commerce, it does not make this decision in a vacuum; instead, the interested party makes this decision in an environment in which Commerce may apply the highest rate as AFA under its hierarchy.

Furthermore, we find that section 776(d)(2) of the Act applies as an exception to the selection of an AFA rate under section 776(d)(1) of the Act; that is, after "an evaluation of the situation that resulted in the application of an adverse inference," Commerce may decide that given the unique and unusual facts on the record, the use of the highest rate within that step is not appropriate.

Therefore, we are applying, where available, the highest above-*de minimis* subsidy rate calculated for the same or comparable program in a Turkey CVD investigation or administrative review as AFA for Celik Halat for the GIIS Customs Duty Exemption program.  For these draft results of redetermination, we can match, based on program names, descriptions, and benefit treatments, the GIIS Customs Duty Exemption program to the Regional Investment Incentive Scheme (RIIS) – Tax Reduction program.

Accordingly, as AFA, for benefit, we are applying a countervailable subsidy rate of 2.27 percent *ad valorem* for Celik Halat and its relevant cross-owned companies for the GIIS Customs Duty Exemption program.[37]

## D.  Corroboration of the AFA Rate

Section 776(c)(1) of the Act provides that, when Commerce relies on secondary information rather than on information obtained in the course of an investigation or review, it shall, to the extent practicable, corroborate that information from independent sources that are reasonably at its disposal.  Secondary information is defined as "information derived from the petition that gave rise to the investigation or review, the final determination concerning the

---

[37] *See Certain Quartz Surface Products from the Republic of Turkey:  Preliminary Affirmative Countervailing Duty Determination, Preliminary Affirmative Critical Circumstances Determination, and Alignment of Final Determination with Final Antidumping Duty Determination*, 84 FR 54841 (October 11, 2019) (*Quartz from Turkey Prelim*), and accompanying IDM at "b. Regional Investment Incentive Scheme - Tax Reduction," unchanged in *Certain Quartz Surface Products from the Republic of Turkey:  Final Affirmative Countervailing Duty Determination and Final Affirmative Determination of Critical Circumstances, in Part*, 85 FR 25400 (May 1, 2020) (*Quartz from Turkey Final*).

subject merchandise, or any previous review under section 751 concerning the subject merchandise." The SAA provides that, to "corroborate" secondary information, Commerce will satisfy itself that the secondary information to be used has probative value. Commerce will, to the extent practicable, examine the reliability and relevance of the information to be used. The SAA emphasizes, however, that Commerce need not prove that the selected facts available are the best alternative information. Furthermore, Commerce is not required to estimate what the countervailable subsidy rate would have been if the interested party failing to cooperate had cooperated or to demonstrate that the countervailable subsidy rate reflects an "alleged commercial reality" of the interested party.

Regarding the reliability aspect of corroboration, unlike other types of information, such as publicly available data on the national inflation rate of a given country or national average interest rates, there typically are no independent sources for data on company-specific benefits resulting from countervailable subsidy programs. With respect to the relevance aspect of corroboration, Commerce will consider information reasonably at its disposal in considering the relevance of information used to calculate a countervailable subsidy benefit. Commerce will not use information where circumstances indicate that the information is not appropriate as AFA.

In the absence of record evidence concerning Celik Halat's usage of the GIIS Customs Duty Exemption program, Commerce reviewed the information concerning Turkish subsidy programs in other cases. Given that we have a program-type match, we find that, because these are similar programs, the matching program is relevant to the GIIS Customs Duty Exemption program. The relevance of this rate is that it is an actual calculated CVD rate for a Turkish program from which the non-responsive company could receive a benefit. Due to the lack of cooperation and the resulting lack of record information concerning this program, Commerce has

corroborated the rate it selected to use as AFA to the extent practicable for this remand redetermination.

## IV.   Analysis of Programs

### A.  Programs Determined to Be Countervailable

#### 1.  IEP

According to the GOT, the IEP consists of four separate incentive schemes:  (1) RIIS; (2) "Large Scale Investment Incentive Scheme"; (3) "Strategic Investment Incentive Scheme"; and (4) GIIS.[38]  The IEP is designed and implemented by the Ministry of Industry and Technology (MoIT) and based on the provisions of the Council of Ministers' Decree No. 2012/3305 (Decree No. 2012/3305), which has been in force since June 2012.[39]  The MoIT issues IICs to companies that apply and meet the criteria pursuant to Decree No. 2012/3305.  According to the GOT, the purpose of the IEP is to reduce regional development disparities by encouraging regional, large scale, and strategic investments.[40]

#### a)  GIIS

Celik Halat stated that it used the GIIS portion of the IEP and had an IIC open during the POI.[41]  Celik Halat also stated that the IIC related solely to the production of non-subject merchandise.[42]  Celik Halat stated that the IIC provided for value-added tax (VAT) and customs duty exemptions for the equipment listed on the IIC.[43]

---

[38] *See* GOT's July 27, 2020 IQR at 78.
[39] *Id*. at 78-79 and Exhibit 26.
[40] *Id*.
[41] *See* Celik Halat's IQR at 23; *see also* Celik Halat's SQR at 2-3.
[42] *Id*.
[43] *See* Celik Halat's SQR at 2-3 and Exhibit 26.

### i)      GIIS VAT Exemption

In the Post-Preliminary Memorandum, we found that the VAT exemption under the IEP program did not confer a countervailable benefit.[44]  Specifically, we found the VAT system in Turkey to be normal.[45]  Therefore, we continue to find the VAT exemption under the GIIS does not confer a countervailable benefit.  Our determination here is consistent with recent cases in which we found the VAT system in Turkey is normal and thus, does not confer countervailable benefit.[46]

### ii)     GIIS Customs Duty Exemption

In the *Preliminary Determination*, we found that the GIIS Customs Duty Exemption program was countervailable.[47]  According to the GOT, once a company has secured an IIC from the MoIT, the company applies to the GOT Customs Authority to import machinery and equipment within a prescribed time.[48]  If approved, the Customs Authority does not charge a customs duty for the specific machinery and equipment imported under the IIC.[49]  We continue to find that the GIIS Customs Duty Exemption program is countervailable because it is a financial contribution in the form of revenue forgone within the meaning of section 771(5)(D)(ii) of the Act and specific within the meaning of section 771(5A)(D)(iii)(I) of the Act.

Pursuant to Decree No. 2012/3305, which governs this program, the exempted import duties, in whole or part, remain payable to the GOT with interest until after the GOT closes out

---

[44] *See* Memorandum, "Post-Preliminary Analysis," dated November 19, 2020 at 10-11 (Post-Preliminary Memorandum), unchanged in *Final Determination*; *see also Quartz from Turkey Final* IDM at Comment 2.
[45] *Id.*
[46] *See Quartz from Turkey Final* IDM at Comment 2; *see also Certain Aluminum Foil from the Republic of Turkey: Final Affirmative Countervailing Duty Determination*, 86 FR 52884 (September 23, 2021), and accompanying IDM at Comment 6.
[47] *See Preliminary Determination* PDM at 23-24; *see also* GOT's July 27, 2020 IQR at 91-92.
[48] *See* GOT's July 27, 2020 IQR at 84.
[49] *Id.*

the relevant IIC and issues a "completion visa."[50]  Thus, pending a successful close-out of the IIC, the company continues to be liable for the exempted customs duties.[51]  It is Commerce's practice to treat any balance on an unpaid liability that may be waived in the future as a contingent-liability interest-free loan pursuant to 19 CFR 351.505(d)(1).[52]  Accordingly, depending on whether the GOT has closed out the IIC, we treat the benefits under this program as either an interest-free contingent liability loan or a grant.  Specifically, we regard the unpaid amounts as an interest-free contingent-liability loan for the period of time before the completion visa is issued, and we treat the amount of customs duty exempted after the GOT issues the completion visa as a grant.[53]  Here, as explained below, had we received a complete response, we could have assessed the benefit pursuant to this methodology.

In section III of our initial questionnaire, we requested that Celik Halat provide a detailed description of this program and its workings.  In addition, we requested that Celik Halat respond to all questions in the Standard Questions Appendix and the Tax Program Appendix for the Customs Duty Exemption programs under the IEP, which includes the GIIS.[54]  In the Standard Questions Appendix, we instructed Celik Halat to specify the criteria it met to receive assistance under the program, including whether the application or approval for assistance was related to specific merchandise.[55]  We also instructed Celik Halat to explain what records it keeps related

[50] See GOT's July 27, 2020 IQR at Exhibit 26 (Decree No. 2012/3305 at Articles 26, 27 and 28); see also Steel Concrete Reinforcing Bar from the Republic of Turkey:  Final Results and Partial Rescission of Countervailing Duty Administrative Review; 2017, 85 FR 42353 (July 14, 2020) (Rebar from Turkey), and accompanying IDM at Comment 4; and Welded Line Pipe from the Republic of Turkey, Final Results of Countervailing Duty Administrative Review, 2015, 83 FR 34113 (July 19, 2018), and accompanying IDM at 7-11.
[51] See Rebar from Turkey IDM at 7-11.
[52] Id. at Comment 4.
[53] Id.
[54] See Commerce's Letters, "Investigation of Prestressed Concrete Steel Wire from the Republic of Turkey," dated June 9, 2020 (Initial Questionnaire) at section III question M.2; and "Countervailing Duty Respondent Selection," dated June 26, 2020, directing the GOT to deliver section III of the questionnaire to Celik Halat.
[55] See Initial Questionnaire at section III, Standard Questions Appendix, question C.

to this program and to provide application and approval documents related to benefits it received.[56]  In the Tax Program Appendix, we instructed Celik Halat to indicate the amount of the tax savings it received pursuant to this program and provide a detailed calculation of the assistance, all source materials, and the amount of tax or loss that would have been due absent this benefit.[57]

In its initial questionnaire response, instead of responding as instructed, Celik Halat did not provide responses to either the Standard Questions Appendix or the Tax Program Appendix for this program.  Celik Halat stated that neither it nor any of its relevant cross-owned affiliates received any benefits under this program during the POI for the production of subject merchandise, but it did have an IIC during the POI related to the production of non-subject merchandise.[58]  However, Celik Halat did not provide any documentation to support its assertion that its IIC was not related to the production of subject merchandise.[59]

Given Celik Halat's incomplete response, we issued a supplemental questionnaire in which we again specifically instructed Celik Halat to provide responses to all questions in the Standard Questions Appendix and the Tax Program Appendix for this program.  We did not limit the questions to program benefits related to subject merchandise.  In its response to the Standard Questions Appendix, Celik Halat stated that it kept copies of the application for the program, as well as records of its compliance with the program by purchasing the specified machinery.[60] Celik Halat also claimed that the application specified that Celik Halat could receive customs

---

[56] *Id*. at section III, Standard Questions Appendix, question D.
[57] *Id*. at section III, Tax Program Appendix, question B.
[58] *See* Celik Halat's IQR at 23.
[59] *Id*.
[60] *See* Celik Halat's SQR at 3.

duty exemptions on imported equipment related to the production of non-subject wire rope.[61]
However, Celik Halat failed to provide its application for the program.

As part of our Tax Program Appendix, we asked if Celik Halat received tax exemptions
under this program.[62]  Celik Halat responded that the program involved the non-applicability of
certain import duties or VAT that might otherwise be charged, but that it did not use this
program to take an exemption from taxes owed, and, thus, the remaining questions were not
relevant.[63]

We also asked Celik Halat to indicate the amount of tax savings derived from use of the
program, provide a detailed calculation and all source materials, and show the amount of tax that
would have been due absent the program.[64]  Celik Halat responded that it received an exemption
from duties or VAT assessments on purchases of equipment, but this exemption had no impact
on its tax savings or deferrals.[65]

Thus, Celik Halat admitted that it received an exemption from customs duties; however,
despite our Tax Program Appendix's clearly-worded statement that we are seeking information
in relation to exemptions from taxes owed, Celik Halat failed twice to respond fully to the
questions in our Tax Program Appendix.  Instead of providing necessary information that would
allow us to assess any benefit conferred under this program, Celik Halat told us that this program
involves the "non-applicability of certain import duties" and made the determination itself that
certain questions are not relevant and that it need not respond.  Due to Celik Halat's incomplete
response, Commerce is unable to assess the benefit under this program.

---

[61] *Id.* at Exhibit 26.
[62] *Id.* at Exhibit 26, Tax Program Appendix.
[63] *Id.*
[64] *Id.*
[65] *Id.*

Further, despite Commerce's multiple requests that Celik Halat provide a detailed description of the GIIS Customs Duty Exemption program and its workings, and respond to all the questions in the Standard Questions and Tax Program Appendices, Celik Halat failed to provide this information.  Celik Halat stated that it had the requested information in its possession, yet Celik Halat did not provide its application for this program or any other records it said that it kept related to the purchase of the machinery that was exempted from customs duties. Instead, the only documents provided by Celik Halat were:  (1) the IIC; (2) general information about the company and a list of commitments to be fulfilled under the IIC; (3) a list of equipment to be imported; and (4) a translation of a completion visa that includes a list of the imported equipment and prices.[66]  Celik Halat did not provide the Turkish original of the completion visa or the attached list of purchased equipment.  Because Celik Halat failed to provide the original documents, we are unable to compare the Turkish original document with the translation to verify the price paid for the machinery or the dates the machinery were acquired.

With respect to Celik Halat's assertions that it did not receive any benefits under this program for the production of subject merchandise during the POI and that the IIC on the record provided confirmation that none of the equipment imported pursuant to the IIC benefited the production of subject merchandise, Celik Halat did not provide evidence sufficient to support its assertions.[67]  The record does not demonstrate that the GIIS Customs Duty Exemption granted by the IIC issued to Celik Halat is tied to non-subject merchandise and, thus, not attributable to subject merchandise.  Although Celik Halat claimed certain documentation limited its application to non-subject merchandise, Celik Halat failed to provide this information, despite claiming to have this information in its possession.

---

[66] *Id*.
[67] *See* Celik Halat's SQR at 2 and Exhibit 26.

Pursuant to 19 CFR 351.525(b)(5)(i), "(i)f a subsidy is tied to the production or sale of a particular product, the Secretary will attribute the subsidy only to that product."  The *CVD Preamble* further explains that "we are extremely sensitive to potential circumvention of the countervailing duty law.  We intend to examine all tying claims closely to ensure the attribution rules are not manipulated to reduce countervailing duties."[68]

In making this determination, Commerce analyzes the intended purpose of the subsidy based on information available at the time the subsidy is bestowed.[69]  In so doing, Commerce's practice is to identify the type and monetary value of a subsidy at the time of bestowal, rather than examine the use or effect of subsidies (*i.e.*, to trace how the benefits are used by companies).[70]  A subsidy is tied only when the intended use is known to the subsidy provider (in this case, the GOT) and so acknowledged prior to, or concurrent with, the bestowal of the subsidy.  For example, in determining whether a loan is tied to a particular product, Commerce examines the loan approval documents; likewise, to determine whether a grant is tied to a particular product, Commerce examines the grant approval documents.[71]  The Court has previously upheld Commerce's analysis in this regard.[72]

There is no information on the record to confirm that the machinery imported under the IICs could not be used for production of subject merchandise besides simple assertions by Celik Halat.  Celik Halat provided no documentation to show that the machinery imported under the IICs could not be used for production of subject merchandise.  None of the information that Celik Halat provided indicates that the IIC is related exclusively and explicitly to the production

---

[68] *See Countervailing Duties*, 63 FR 65348, 65403 (November 25, 1998) (*CVD Preamble*).
[69] *Id.*, 63 FR at 65403-04.
[70] *See Certain Uncoated Groundwood Paper from Canada:  Final Affirmative Countervailing Duty Determination*, 83 FR 39414 (August 9, 2018), and accompanying IDM at Comment 34.
[71] *Id.*
[72] *See Maverick Tube Corp. v. United States*, Slip Op. 16-16, Consol. Court No. 14-00229 (CIT 2016), *aff'd*, *Maverick Tube Corp. v. United States*, 857 F.3d 1353 (Fed. Cir. 2017).

21

of non-subject merchandise, other than statements to that effect by Celik Halat.[73]  Further, the

approval documents, *i.e.*, the IIC, does not state that the duty exemptions under this IIC can only

be used for the production of wire rope.  Rather, the only information on the record is that an IIC

that contained customs duty and VAT exemptions was granted to Celik Halat, the company, of

which its business includes the production of the subject merchandise.[74]  Thus, we do not find

that information on the record demonstrates that the imported machines could only be used for

wire rope production and not for the production of subject merchandise.

Further, whether the IIC was tied to non-subject merchandise is a matter to be determined

by Commerce, not Celik Halat.  Thus, a full response from Celik Halat was required even if, in

Celik Halat's opinion, the IIC was tied to non-subject merchandise.  We provided Celik Halat a

second opportunity to submit a complete response when we issued the supplemental

questionnaire, but Celik Halat again provided an incomplete response.  Due to the incomplete

responses that Celik Halat gave in response to our instructions in the supplemental questionnaire,

we are unable to analyze Celik Halat's benefit under this program.

As described above, Commerce treats benefits under this program as either:  (1) interest-

free contingent-liability loans; or (2) grants, depending on whether the GOT issued the

completion visa.  Here, Celik Halat provided a completion visa, therefore, we would treat the

benefits under this program as a grant if we knew the amount of duties exempted.  However,

despite our multiple requests, Celik Halat failed to provide the necessary information to calculate

the benefit amount.  Thus, because Celik Halat withheld requested information, we find it is

appropriate to apply facts available, pursuant to section 776(a) of the Act.  Additionally, we find

it is appropriate to apply an adverse inference, pursuant to section 776(b) of the Act, because

---

[73] *See* Celik Halat's IQR at 23; and Celik Halat's SQR at 2-3 and Exhibit 26.
[74] *See* Celik Halat's SQR at Exhibit 26.

Celik Halat did not cooperate to the best of its ability to provide complete information regarding the benefit of this program, despite Commerce's multiple requests and evidence that Celik Halat had this information in its possession. Thus, we are applying an AFA rate for this program, as described in the section "Use of AFA," above.

## 2. Research and Development (R&D) Incentives

The GOT reported that R&D incentives are available to support R&D activities (*e.g.*, development of technological knowledge and innovation in product and production processes).[75] Under the Law on Supporting Research, Development, and Design Activities (Law No. 5746), the MoIT provides support to technology centers, R&D centers, and R&D projects.[76] Benefits provided under Law No. 5746 include, but are not limited to, corporate income tax deductions for R&D and design related expenses; income tax exemptions for the salaries of R&D personnel; and insurance premium support.[77] Commerce previously found that government assistance provided under Law No. 5746 is countervailable.[78]

Celik Halat applied for recognition as an R&D center, as required by the Law No. 5746, and its R&D center was recognized on March 26, 2018.[79]

## a. Corporate Income Tax Deductions for R&D Expenses

Celik Halat's tax return filed during the POI indicates that it claimed a corporate income tax deduction for R&D expenses under Law No. 5746.[80] We find that the income tax deduction constitutes a financial contribution in the form of revenue forgone within the meaning of section 771(5)(D)(ii) of the Act. The income tax deduction provides a benefit in the amount of tax

---

[75] *See* GOT's July 27, 2020 IQR at 118.
[76] *Id*. at 118-119.
[77] *Id*. at Exhibit 35.
[78] *See Quartz from Turkey Prelim* PDM at 17-19, unchanged in *Quartz from Turkey Final*.
[79] *See* Celik Halat's IQR at Exhibit 17.
[80] *See* Celik Halat's SQR at Exhibit 7A.

savings to the company pursuant to section 771(5)(E) of the Act.  We also find that this program

is specific according to section 771(5A)(D)(i) of the Act because the enterprises eligible for this

program are limited to enterprises that maintain technology center businesses, R&D centers, and

design centers as specified in Article 1(2) of Law No. 5746.[81]

Pursuant to 19 CFR 351.524(c)(1), Commerce typically treats tax deductions as recurring

benefits.  Therefore, we determine that this program provides a recurring benefit.  The amount of

the benefit is equal to the tax that would have been paid absent the program (*i.e.*, the tax

savings).  To determine that benefit, we took the amount Celik Halat deducted from its taxable

income under this program on its 2018 corporate income tax return filed during the POI and

multiplied it by the corporate tax rate in effect at the time it filed its return.[82]  To calculate a

subsidy rate we divided Celik Halat's POI benefit by its POI total sales.  On this basis, we

determine that Celik Halat received a net countervailable subsidy rate of 0.09 percent *ad valorem*

under this program.[83]

### b. Insurance Premium Support

Celik Halat reported that it received benefits under the Insurance Premium Support

portion of the R&D Incentives program.[84]  We determine that this support is a financial

contribution in the form of direct transfer of funds within the meaning of section 771(5)(D)(i) of

the Act because Celik received direct support from the MoIT.  We determine that Celik Halat

benefitted under section 771(5)(E) of the Act in the amount of the insurance premium support it

received from the MoIT.[85]  We also find that this program is specific according to section

---

[81] *See* GOT's July 27, 2020 IQR at Exhibit 29.
[82] *See* Memorandum, "Final Remand Redetermination Calculations for Celik Halat ve Tel Sanayi A.S.," April 15, 2022 (Celik Halat Final Remand Calculation Memorandum).
[83] *Id*.
[84] *See* Celik Halat's IQR at 26 and Exhibit 17.
[85] *Id*.

771(5A)(D)(i) of the Act because the enterprises that are eligible for this program are limited to those that maintain technology center businesses, R&D centers, and design centers as specified in Article 1(2) of Law No. 5746.[86]  To calculate a subsidy rate, we divided Celik Halat's POI benefit by its total POI sales.  On this basis, we determine a net countervailable subsidy rate of 0.03 percent *ad valorem* for Celik Halat under this program.[87]

### 3.      Foreign Fair Support

Under the Foreign Fair Support program, the Ministry of Trade reimburses Turkish companies for certain expenditures related to their participation in international trade fairs abroad.[88]  The purpose of this program is to increase exports and support the promotional activities of the exhibition organizers.[89]  The Foreign Fair Support program is regulated by the "Decree on Supporting Participation to Fairs in Abroad" numbered 2017/4, which replaced the Communique on Supporting Participation in Fairs Abroad, no. 2009/5, in July 2017.[90]

Celik Halat reported that it benefitted from this program.[91]  According to the Decree on Supporting Participation to Fairs in Abroad no. 2017/4, the support under the program is provided to Turkish corporations that are members of the exporters' associations and entities that will participate in trade fairs abroad.[92]  The program provides reimbursement of up to 50 percent of eligible transportation services, exhibition booth fees/rent, and travel tickets of company representatives.[93]

---

[86] *See* GOT's July 27, 2020 IQR at Exhibit 29.
[87] *See* Celik Halat Final Remand Calculation Memorandum.
[88] *See* GOT's July 27, 2020 IQR at 138-39.
[89] *Id*. at 138-39 and Exhibit 32.
[90] *Id*. at 139.
[91] *See* Celik Halat's IQR at 28 and Exhibit 18.
[92] *See* GOT's July 27, 2020 IQR at Exhibit 32.
[93] *Id*. at 138 and Exhibit 32.

We determine that this program provides a financial contribution in the form of direct transfer of funds under section 771(5)(D)(i) of the Act because Celik Halat received reimbursement from the Ministry of Trade for expenses covered by this program.  We determine that Celik Halat benefitted from Foreign Fair Support under section 771(5)(E) of the Act in the amount of the reimbursement for expenses incurred related to its participation in international trade fairs.[94]  We determine that the program is export-contingent within the meaning of sections 771(5A)(A) and (B) of the Act because it is provided to Turkish corporations that are members of the exporters' associations and entities that will participate in trade fairs abroad.[95]

Pursuant to 19 CFR 351.524(c)(1), we normally treat grants as non-recurring subsidies, and we normally allocate the benefits from non-recurring subsidies over the average useful life (AUL) of renewable physical assets used in the production of subject merchandise.[96]  In the initial questionnaire, we notified Celik Halat that the AUL period for this investigation is 15 years, on the basis of U.S. Internal Revenue Service's Depreciation Range System, and Celik Halat did not seek to rebut this AUL period.[97]

Furthermore, for non-recurring subsidies, we apply the "0.5 percent test," as described in 19 CFR 351.524(b)(2).  Under this test, we divide the amount of subsidies approved under a given program in a particular year by the relevant sales value (*e.g.*, total sales or export sales) for the year in which assistance was approved.  If the amount of the subsidies is less than 0.5 percent of the relevant sales value, then the benefits are allocated to the year of receipt rather than over the AUL period.  If the amount of the subsidies is greater than 0.5 of the relevant sales value, we

---

[94] *See* Celik Halat's IQR at 28.
[95] *See* GOT's July 27, 2020 IQR at Exhibit 32.
[96] *See* 19 CFR 351.524(b).
[97] *See* Celik Halat's IQR at 13.

use the standard grant allocation methodology described under 19 CFR 351.524(d)(1) to determine the amount of the exemption attributable to the POI.

Because we find that the Foreign Fair Support program is a non-recurring subsidy, normally, we would apply this "0.5 percent test" with respect to this program for each year during the AUL period.  However, Celik Halat only reported the amount of subsidies it received, the date of receipt, and its total export sales value for the POI.  Therefore, because necessary information is missing from the record, we used facts available for the "0.5 percent test," pursuant to section 776(a) of the Act.  Specifically, we used the amount that the GOT reported paying to Celik Halat pursuant to this program for each year of the AUL period other than the POI as the numerator, and Celik Halat's POI export sales value as the denominator for each year.[98]  We also used the date of payment reported by the GOT as the date of approval as facts available.  On this basis, we determined that all grants under this program were expensed in the years in which the grants were received.[99]

To calculate the net countervailable subsidy rate for Celik Halat during the POI, we divided the total POI benefit to Celik Halat by its total export sales during the POI.  On this basis, we find that Celik Halat received a net countervailable subsidy rate of 0.03 percent *ad valorem* for this program.[100]

4.      **Scientific and Technological Research Council of Turkey (TUBITAK) Grants**

The GOT reported that the 1501 TUBITAK Industrial R&D Projects Grant program was created to increase research-technology development capability, innovation culture, and

---

[98] *See* Celik Halat Final Remand Calculation Memorandum.
[99] *Id*.
[100] *Id*.

competitiveness of companies.[101]   The purpose of this program is to support R&D projects to: (1) develop or improve new products; (2) develop new techniques to diminish the cost and/or raise the quality and standard of a product; and (3) develop new production technologies.[102]   The GOT reported that any company can apply for and receive reimbursement of up to 75 percent of approved expenses under this program, regardless of region or sector.[103]

Celik Halat reported that it received funding under this TUBITAK grant program for two projects during the AUL period:  one project was approved in 2012 and the other in 2019.[104]   We determine that this program provides a financial contribution in the form of a direct transfer of funds under section 771(5)(D)(i) of the Act because Celik Halat received reimbursement from the TUBITAK for expenses covered by this program.  We determine that Celik Halat benefitted under section 771(5)(E) of the Act in the amount of the reimbursement for expenses incurred related to its participation in the program.[105]   Because the actual recipients are limited in number, we determine that this program is *de facto* specific, in accordance with section 771(5A)(D)(iii)(I) of the Act.[106]

As noted above, we normally treat grants as non-recurring subsidies and apply the "0.5 percent test."  However, Celik Halat failed to provide any documents relating to the grants or the approval amounts for any TUBITAK grants.[107]   Additionally, Celik Halat did not provide AUL sales information for any year other than the POI.  Therefore, because the approval amounts and AUL sales information are missing from the record, we are using facts available regarding the "0.5 percent test" for the TUBITAK grant program, pursuant to section 776(a) of the Act.

---

[101] *See* GOT's July 27, 2020 IQR at 170.
[102] *Id*.
[103] *Id*.
[104] *See* Celik Halat's IQR at 29 and Exhibit 19.
[105] *Id*.
[106] *See* GOT's July 27, 2020 IQR at 179.
[107] *See* Celik Halat's IQR at Exhibit 19.

Specially, regarding the 2012 project, as facts available, we: (1) summed all funds that Celik

Halat received in subsequent years relating to the 2012 project and treated the sum as the

approval amount for 2012; and (2) used the POI sales amount as the denominator. Regarding the

2019 project, we used the amount that Celik Halat received under the 2019 program as the

approval amount as facts available and divided this amount by the POI sales value. As a result

of these calculations, all payments of funds relating to the 2012 and 2019 grant approval were

expensed in the year received.[108]

        To calculate the net countervailable subsidy rate attributable to Celik Halat, we divided

the total POI benefit to Celik Halat by its total sales during the POI. On this basis, we find that

Celik Halat received a net countervailable subsidy rate of 0.03 percent *ad valorem* for this

program.[109]

        ### 5.        Rediscount Loan Program

        The Rediscount Loan program (formerly known as the Short-Term Pre-Shipment

Rediscount program) was established in October 1999 and is designed to increase the

competitive power of manufacturers and exporters producing goods for export.[110] This program

was established within the framework of the Central Bank of the Republic of Turkey's (Central

Bank of Turkey's) "Circular on Export and Foreign Exchange Earning Services Rediscount

Credits" and is administered by the Export Credit Bank of Turkey (ExIm Bank of Turkey), as

well as commercial banks that apply to be administering banks with the Central Bank of

Turkey."[111] Loans issued under this program are short-term in nature and applied for on an on-

---

[108] *See* Celik Halat Final Remand Calculation Memorandum.
[109] *Id.*
[110] *See* GOT's Letter, "Response of the Government of Turkey Initial Questionnaire in Countervailing Duty Investigation on Prestressed Concrete Steel Wire from the Republic of Turkey," dated August 7, 2020 (GOT's August 7, 2020 IQR) at 9.
[111] *Id.* at 9-10.

going basis.[112]  A loan application is required for each loan obtained.[113]  The Central Bank of

Turkey funds the program and is the ultimate approval authority for these loans, whether the

loans are administered by ExIm Bank of Turkey or commercial banks.[114]  For the loans

administered by the commercial banks, the applicants apply to the commercial bank to utilize the

credit, and the commercial bank processes the application.  If the bank concludes that the

applicant firm is worthy of the credit, it applies to the Central Bank of Turkey by submitting a

credit application form.[115]  If the Central Bank of Turkey approves the credit, the amount of the

credit in Turkish lira is wired to the commercial bank, and the bank then pays the credit to the

applicant firm.[116]  Commerce previously found this program to be countervailable.[117]

        We find that loans from this program constitute a financial contribution in the form of a

direct transfer of funds from the government under section 771(5)(D)(i) of the Act in the case of

the loans provided by the ExIm Bank of Turkey.  We also find that loans from this program

provided by commercial banks constitute a financial contribution in the form of direct transfer of

funds from the government under section 771(5)(D)(i) of the Act because the funds are provided

and approved by the Central Bank of Turkey for the commercial banks to disburse to the

participating companies.  We also find that this program is specific in accordance with section

771(5A)(B) of the Act because receipt of the loans is contingent upon export performance.

---

[112] *Id*.
[113] *Id*. at 13-14.
[114] *Id*. at 14.
[115] *Id*.
[116] *Id*.
[117] *See Large Diameter Welded Pipe from the Republic of Turkey:  Preliminary Affirmative Countervailing Duty Determination and Alignment of Final Determination with Final Antidumping Duty Determination*, 83 FR 30697 (June 29, 2018), and accompanying PDM at 15, unchanged in *Large Diameter Welded Pipe from the Republic of Turkey:  Final Affirmative Countervailing Duty Determination*, 84 FR 6367 (February 27, 2019), and accompanying IDM at 4.

Celik Halat reported the interest rate on the loans it received under this program.[118]  Celik Halat also reported short-term comparable commercial loans it received during the POI.[119]  Pursuant to 19 CFR 351.505(a)(1), the benefit under this program is the difference between the amount Celik Halat paid on the loan under the program and the amount that would have been required under a comparable commercial loan.  To calculate the net countervailable subsidy rate attributable to Celik Halat, we divided the total POI benefit to Celik Halat by its export sales during the POI.  We incorporated changes as discussed in Comment 2, below.  On this basis, we determine that Celik Halat received a net countervailable subsidy rate of 0.45 percent *ad valorem* under this program.[120]

## 6.    Post-Shipment Rediscount Credit (PSRC) Program

The PSRC program was originally established as the Short Term Export Credit Discount program in October 1996 and revised to its current form in 2012.[121]  It is designed to increase the competitiveness of Turkish exporters in international markets.[122]  This program is funded by the Central Bank of Turkey and is administered by the ExIm Bank of Turkey.[123]  The program is a post-shipment finance facility, and credits issued under this program are either through a short term credit insurance policy or a guarantee by a commercial bank.[124]

We find that factoring loans under this program constitute a financial contribution in the form of a direct transfer of funds from the government under section 771(5)(D)(i) of the Act as this program is funded by the Central Bank of Turkey.  We also find that this program is specific

---

[118] *See* Celik Halat's SQR at Exhibit 27a.
[119] *Id.*
[120] *See* Celik Halat Final Remand Calculation Memorandum.
[121] *See* GOT's August 7, 2020 IQR at 32.
[122] *Id.* at 31.
[123] *Id.* at 32.
[124] *Id.* at 39.

in accordance with section 771(5A)(B) of the Act because receipt of the loans is contingent upon export performance.

Celik Halat reported the interest rate on the loans it received under this program.[125]  Celik Halat also reported short-term comparable commercial loans it received during the POI for certain of these loans.[126]  For loans for which it did not report a comparable commercial loan, we used a standard benchmark comparable commercial loan rate.[127]  Pursuant to 19 CFR 351.505(a)(1), the benefit under this program is the difference between the amount Celik Halat paid on the loan under the program and the amount that would have been required under a comparable commercial loan.  To calculate the net countervailable subsidy rate attributable to Celik Halat, we divided the total POI benefit to Celik Halat by its export sales during the POI. We have incorporated the changes as discussed in Comment 2, below.  On this basis, we determine that Celik Halat received a net countervailable subsidy rate of 0.01 percent *ad valorem* under this program.[128]

## V.    INTERESTED PARTY COMMENTS

On March 21, 2022, Commerce released the Draft Results to all interested parties and invited parties to comment.[129]  On March 21, 2022, the petitioners submitted comments on Celik Halat's response to the in lieu of verification questionnaire.[130]  On March 25, 2022, the

---

[125] *See* Celik Halat's SQR at Exhibit 27a.
[126] *Id*. at Exhibit 27b.
[127] *See* Celik Halat Final Remand Calculation Memorandum.
[128] *Id*.
[129] *See Celik Halat ve Tel Sanayi A.S. v. United States*, Consol. Court No. 21-00050, Slip Op. 22-13 (CIT February 15, 2022) (*Remand Order*), Draft Results of Redetermination Pursuant to Court Remand**,** dated March 21, 2022 (Draft Results).
[130] *See* Petitioners' Letter, "Petitioners' Comments on Celik Halat ve Tel Sanayi A.S.'s Verification Questionnaire Response," dated March 21, 2022 (Petitioners' Verification Comments).

petitioners and Celik Halat submitted comments on the Draft Results.[131]  We address these comments below.

## Comment 1:  Application of AFA to Celik Halat's Loan Programs

*Petitioners' Comments*

- Consistent with its application of AFA to the GIIS Customs Duty Exemption program, Commerce should amend the Draft Results to select an AFA rate of 1.96 percent *ad valorem* to reflect Celik Halt's benefit from the Rediscount Loan program given the missing and inconsistent information provided by Celik Halat regarding its loan reporting in this proceeding.[132]

- The Act requires Commerce to verify all information relied upon in making a determination in an investigation.[133]  Commerce is required to resort to facts available if an interested party provides information that cannot be verified.[134]  If Commerce also determines that the inability to verify is a result of a party's failure to cooperate "to the best of its ability to comply with a request for information," Commerce "may use an inference that is adverse to the interests of that party in selecting from among the facts otherwise available."[135]  The application of this legal standard in this proceeding demonstrates that the application of AFA is warranted with respect to this program.[136]

- In Commerce's In Lieu of On-Site Verification Letter, Commerce asked Celik Halat to provide loan trace documentation for two loans that Celik Halat reported.[137]  Celik Halat

---

[131] *See* Petitioners' Letter, "Petitioners' Comments on the Department's Draft Remand Redetermination," dated March 25, 2022 (Petitioners' Comments); and Celik Halat's Letter, "Comments on Draft Redetermination of Celik Halat ve Tel Sanayi A.S.," dated March 25, 2022 (Celik Halat's Comments).
[132] *See* Petitioners' Comments at 2 and 8 (citing Draft Results at 6-7 and 16-23).
[133] *Id*. at 3 (citing section 782(i)(1) of the Act).
[134] *Id*. (citing section 776(a)(2) of the Act).
[135] *Id*. (citing section 776(b)(1) of the Act; and *Nippon v. United States*, 337 F.3d 1373, 1382 (Fed. Cir. 2003)).
[136] *Id*.
[137] *Id*. 3-4 (citing Commerce's In Lieu of On-Site Verification Letter at 4).

failed to provide the specific documentation requested by Commerce for either loan despite Commerce's warning that failure to provide the documentation might result in the application of partial or total facts available pursuant to section 776(a) of the Act, which may also include AFA pursuant to section 776(b) of the Act.[138]  Commerce has previously applied AFA to a loan program due to a respondent's failure to verify loan information.[139]

- Regarding Loan Control Number 24, Celik Halat did not submit the loan application or loan approval documents, including the loan agreement, as requested.[140]  Celik Halat's sole supporting documentation is an email that lists the "various invoices being factored."[141]  Celik Halat did not provide an explanation for its omission of the requested loan documents, thus demonstrating a lack of effort to comply to the "best of its ability."[142]

- For Loan Control Number 4, Celik Halat's response to Commerce's In Lieu of On-Site Verification Letter does not reconcile with its previous submissions.[143]  Celik Halat's Verification QR states that the interest on the loan consisted of a pre-paid amount shown on the loan release document and an additional "credit interest charge" shown on the booking voucher.[144]  The provided information does not substantiate the earlier

---

[138] *Id*. at 4 and 6 (citing Commerce's In Lieu of On-Site Verification Letter at 2).
[139] Id. at 7 (citing *Final Determination of Common Alloy Aluminum Sheet from the People's Republic of China*, 83 FR 57427 (November 15, 2018), and accompanying IDM at Comment 6; *Final Determination of Certain Polyethylene Terephthalat Resin from the People's Republic of China*, 81 FR 13337 (March 14, 2017), and accompanying IDM at Comment 5; and *Final Determination of Truck and Bus Tires from the People's Republic of China*, 82 FR 8606 (January 27, 2017), and accompanying IDM at Comment 28).
[140] *Id*. at 4 (citing Celik Halat's Verification QR at 5-6 and Exhibit 33a).
[141] *Id*. (citing Celik Halat's Verification QR at 5 and Exhibit 33a).
[142] *Id*. at 4-5 (citing Celik Halat's Verification QR at 5-6).
[143] *Id*. at 5 (citing Celik Halat's Verification QR; and Celik Halat's SQR at Exhibit 27a).
[144] *Id*. (citing Celik Halat's Verification QR at 7 and Exhibit 33b).

submissions.[145]  Therefore, the interest rate remains unverified and the inexplicable

discrepancies undermines the accuracy of all of Celik Halat's loan information, rendering

the information unreliable and unusable pursuant to section 776(a)(2) of the Act.[146]

*Celik Halat's Comments*

- Commerce's treatment of this program was appropriate and accurate, and the subsidy rate
  should be confirmed in the final remand redetermination.[147]

**Commerce's Position:**

Section 776(a) of the Act directs that Commerce shall use the facts otherwise available in

reaching a determination if:  (1) necessary information is not available on the record; or (2) an

interested party or another other person; (A) withholds information that has been requested by

the administering authority or the Commission under this title; (B) fails to provide such

information by the deadlines for submission of the information or in the form and manner

requested subject to subsection(c)(1) and (e) of section 782; (C) significantly impedes a

proceeding under this title; or (D) provides such information that cannot be verified as provided

in section 782(i).  Further, section 776(b) of the Act provides that, if Commerce finds that an

interested party has failed to cooperate by not acting to the best of its ability to comply with a

request for information, Commerce may use an inference that is adverse to the interest of that

party in selecting from the facts otherwise available.

In this case, we find that basing Celik Halat's subsidy rate for the Rediscount Loan

program for these final results of redetermination on the application of AFA under section 776(b)

of the Act is not warranted.  Specifically, we find that the necessary information is available on

---

[145] *Id*. 5-6 (citing Celik Halat's Verification QR at 7 and Exhibit 33b; and Celik Halat's SQR at Exhibit 27a).
[146] *Id*. at 6 (citing Celik Halat's SQR at Exhibit 27a).
[147] *See* Celik Halat's Comments at 1-2.

the record of this investigation and that Celik Halat has not withheld information, failed to provide information within established time limits, significantly impeded this proceeding, or provided information that cannot be verified for this program. We find that Celik Halat cooperated with Commerce's requests for information in this remand proceeding regarding this program and that it answered each request for information to the best of its ability with respect to this program. Therefore, we find no basis to apply facts available or facts available with an adverse inference to this program.

We do not agree that the differences between Celik Halat's initial and later responses call into doubt Celik Halat's loan reporting for the POI. We find all the differences between the initial and supplemental responses to be adequately explained by Celik Halat as described below for each loan. We also find the materials provided in response to Commerce's In Lieu of On-Site Verification Letter to be consistent with Celik Halat's reported loan information.

For the Rediscount Program Loan Control Number 4, we find that Celik Halat provided documentation of payment that confirmed the interest rate and payments reported and that we were able to verify the loan using the information provided. We find that the differences in the amounts in Turkish lira are due to conversion and rounding errors and that the fees paid on the loan are adequately documented in Celik Halat's Verification QR.[148] Further, we find the difference in the reported interest rate and the annualized rate to be adequately verified and any other differences to be due to insignificant rounding errors.[149]

Regarding PSRC Program Loan Control Number 24, we agree that Celik Halat did not provide loan application and approval information. Therefore, Celik did not show that this program is not a government subsidized loan program. Accordingly, we continue to determine

---

[148] *See* Celik Halat's Verification QR at 6-7 and Exhibit 33.
[149] *Id*. at 8.

that the transactions were administered by the ExIm Bank of Turkey and funded by the Central Bank of Turkey, which also had ultimate approval authority under the PSRC program, as discussed above.  Thus, this program provides a financial contribution.

Therefore, based on the information on the record, we determine that the application of AFA to Celik Halat to determine its subsidy rate for the Rediscount Loan program in this proceeding is not warranted.  Consequently, we continue to rely on Celik Halat's reported loan information to calculate its *ad valorem* subsidy rate for the Rediscount Loan program for these final results of redetermination.

**Comment 2:   Celik Halat's Rediscount Loans and Loan Benchmark Interest Rates**

*Petitioners' Comments*

- In the Draft Results, Commerce found the Rediscount Loan program was countervailable and calculated a benefit of 0.09 percent *ad valorem* for Celik Halat during the POI.[150] Commerce also found the PSRC program to be countervailable, but determined that Celik Halat did not receive a measurable benefit.[151]  Should Commerce not apply AFA, Commerce should correct its calculations to accurately determine Celik Halat's countervailable benefits under these programs.[152]

- Celik Halat initially reported three types of loans during the POI:  (1) loans directly from ExIm Bank of Turkey; (2) "other financing" from commercial banks; and (3) loans "facilitated" by ExIm Bank of Turkey that were extended by private factoring

---

[150] *See* Petitioners' Comments at 8 (citing Draft Results at 30-31).
[151] *Id*. (citing Draft Results at 31).
[152] *Id*.

companies.[153]  In its supplemental response, Celik Halat revised its loan table to include

missing information and amend the "lender" of the factoring loans.[154]

- Celik Halat's loan reporting is contradicted by record evidence from the GOT.[155]  The

  GOT reported that the Rediscount Loan program is administered by ExIm Bank of

  Turkey and commercial banks through the Central Bank of Turkey.[156]  The GOT also

  reported that Celik Halat received Rediscount Loan program financing from the ExIm

  Bank of Turkey and commercial banks during the POI.[157]  Based on the GOT's

  information, there are discrepancies with Celik Halat's reporting of its loans received

  during the POI.[158]  Commerce should, therefore, treat certain of Celik Halat's loans as

  Rediscount Loan program loans in calculating the benefit under the program.[159]

- Commerce should use Dogan Holding loans as the benchmark for certain short-term

  loans.[160]  For certain other loans under the PSRC program, Commerce used a short-term

  benchmark that does not comport with Commerce's regulation that defines comparable

  commercial loans based on the structure of the loans, the maturity of the loans, and the

  currency in which the loans are denominated.[161]  Therefore, Commerce should correct the

  benchmarks used in the Draft Results to accurately calculate Celik Halat's

  countervailable benefits under these programs.[162]

---

[153] *Id*. at 8-9 (citing Celik Halat's IQR at 18-19, 30, and Exhibit 15).
[154] *Id*. at 9 (citing Celik Halat's SQR at 3-4 and Exhibit 27).
[155] *Id*.
[156] *Id*. (citing GOT's August 7, 2020 IQR at 9-10).
[157] *Id*. at 9-10 (citing GOT's August 7, 2020 IQR at 11 and Exhibit 3; and Celik Halat's SQR at Exhibit 27).
[158] *Id*. at 10.
[159] *Id*. (citing Draft Results at Attachments 7 and 9).
[160] *Id*. at 11 (citing Celik Halat's SQR at Exhibit 27b).
[161] *Id*. (citing Draft Results at Attachments 8 and 9; and 19 CFR 351.505(a)(2)(ii)).
[162] *Id*.

*Celik Halat's Comments*

- Commerce's treatment of the Rediscount and PSRC programs was appropriate and accurate, and the subsidy rate should be confirmed in the final remand redetermination.[163]

**Commerce's Position:**

We agree with the petitioners and, for the final results of redetermination, we find that certain of Celik Halat's loans under this program are countervailable. We also changed our benchmarks used to calculate the benefit under the Rediscount Loan program and the PSRC program.

As stated above, the Rediscount Loan program (formerly known as the Short-Term Pre-Shipment Rediscount program) was established in October 1999 and is designed to increase the competitive power of manufacturers and exporters producing goods for export.[164] This program was established within the framework of the Central Bank of the Republic of Turkey's (Central Bank of Turkey's) "Circular on Export and Foreign Exchange Earning Services Rediscount Credits" and is administered by the ExIm Bank of Turkey, as well as commercial banks that apply to be administering banks with the Central Bank of Turkey. The GOT stated in its August 7, 2020 IQR that, in 2016, the Rediscount Loan program was amended to allow companies to apply for loans under this program from either ExIm Bank of Turkey or commercial banks.[165] Celik Halat had some of its loans under the Rediscount Loan program through ExIm Bank of Turkey and some through commercial banks.[166] The ExIm Bank of Turkey loans are administered by the ExIm Bank of Turkey, while the commercial bank loans are administered by

---

[163] *See* Celik Halat's Comments at 1-2.
[164] *See* GOT's August 7, 2020 IQR at 9.
[165] *Id.*
[166] *Id.* at 11.

the commercial banks that have been approved by the Central Bank of Turkey.[167]  The ultimate

approval authority and source of the funds sent to the company is the Central Bank of Turkey,

whether the application is through ExIm Bank of Turkey or through commercial banks.

Therefore, all loans under the Rediscount Loan program are countervailable.[168]

In our Draft Results, we found that the loans administered by commercial banks were

comparable commercial loans because we did not understand that both the source of the funds

and the ultimate approval authority for these loans was the Central Bank of Turkey.  Because we

now find all loans pursuant to the Rediscount Loan program reported by Celik Halat to be

countervailable, we are changing our calculation of the benefit for these loans, as discussed in

the Rediscount Loan program section, above.

We also find merit in the petitioners' argument that we failed to use the proper short-term

benchmark for the PSRC program, and we have revised our calculation of the benefit under this

program as well, as discussed in the PSRC program section, above.

**Comment 3:  Application of AFA to the GIIS Customs Duty Exemption Program**

*Celik Halat's Comments*

- Commerce should fill any gaps on the record with respect to the GIIS Customs Duty
  Exemption program with neutral facts available and not with AFA, consistent with the
  instructions of the Court.[169]  The short deadline made it clear that Commerce was not to
  conduct new factfinding, but to take the record as submitted and calculate a rate from that
  information.[170]

---

[167] *Id*. at 10.
[168] *See* section 5. Rediscount Program, above.
[169] *See* Celik Halat's Comments at 3 (citing *Remand Order* at 37)
[170] *Id*.

- Commerce's inability to ask follow-up questions, require clarifying information, or conduct extensive verification was due to Commerce's unjustified rejection of Celik Halat's initial response during the investigation, particularly considering Celik Halat's continued attempts to cooperate.[171]

- Thus, the clear implication of the Court's imposition of a short, expedited timeline was that Commerce was to accept all facts in Celik Halat's submission and to fill any gaps or missing information with neutral facts available.  Imposition of AFA because of gaps in the record would contravene the Court's direction that "Commerce should not be given the opportunity here to levy another type of sanction."[172]

- Rather than comply with the Court's instructions, Commerce attempted to perform half a year's worth of supplemental questionnaires and verification into just two weeks.[173] Given Commerce's renewed threats to re-impose an AFA rate, Celik Halat had no choice but to comply.[174]  Although Celik Halat requested extensions of time to reply to the extensive information requests, Commerce declined to grant them in full, citing the Court's deadline.[175]

- Given Commerce's rushed procedures, some incomplete information was inevitable. Commerce seized on such minor incompleteness with respect to the GIIS Customs Duty

---

[171] *Id*. at 3-4 (citing *Remand Order* at 37).
[172] *Id*. at 4 (citing *Remand Order* at 37).
[173] *Id*.
[174] *Id*. (citing Commerce's Letter, "Supplemental Questionnaire," dated February 28, 2022 at 1-2; and Commerce's In Lieu of On-Site Verification Letter at 2).
[175] *Id*. at 4-5 (citing Celik Halat's Letters, "Celik Halat's Extension Request for Post-Resubmission Supplemental Questionnaire Response," dated March 1, 2022; and "Extension Request for Translations of Two Post-Resubmission Supplemental Exhibits," dated March 7, 2022).

Exemption program.[176]  Commerce wrongly and unjustifiably proposed an AFA rate of 2.27 percent for this program.[177]

- The AFA rate should be removed because all benefits under the program related solely to non-subject merchandise.[178]  Commerce's questionnaire is clear that programs that do not confer subsidies on the "manufacture, production, or exportation of subject merchandise" are not within the purview of the investigation.[179]  Celik Halat accurately responded that it did not apply for or receive any benefits under this program for the production of subject merchandise during the POI.[180]  Celik Halat did not provide information other than the benefits related solely to the production of wire rope or provide any responses to any appendices because a benefit limited to wire rope is not relevant to the investigation.[181]

- Celik Halat provided answers to the questions in the Standard Questions Appendix and the Tax Program Appendix and included the approval letter for the application and the investment certificate, as well as a detailed list of equipment authorized under the program in Turkish and English, in addition to the completion visa showing that the equipment had been purchased and the terms of the program fulfilled.[182]  Celik Halat confirmed by its statements that the machinery cannot be used for the production of subject merchandise and that the GIIS Customs Duty Exemption related exclusively to the production of non-subject merchandise.[183]

---

[176] *Id*. at 5.
[177] *Id*.
[178] *Id*. at 6.
[179] *Id*. (citing Initial Questionnaire, section III at 1).
[180] *Id*. (citing Celik Halat's IQR at 23).
[181] *Id*. at 6-7.
[182] *Id*. at 7 (citing Celik Halat's SQR at 2 and Exhibit 26).
[183] *Id*.

- Commerce based the application of AFA on Celik Halat's failure to provide information that Commerce did not request: (1) the rate of duty on the imported equipment; (2) the amount of unpaid duty due to the program; (3) specifics on the equipment beyond the listing in the application and completion visa; or (4) documentation to prove the equipment was not related to the production of subject merchandise.[184] The information was never requested by Commerce, and the application of AFA is improper because no information was withheld by Celik Halat.[185]

- Celik Halat explained and certified that the IIC received pursuant to the GIIS program was not related to the production of subject merchandise because the certificate was limited to the purchase of bundling and stranding machines for the production of non-subject wire rope.[186] Wire rope cannot be made on equipment for the production of PC stand, and PC strand cannot be made on equipment for the production of wire rope.[187]

- Commerce claims that Celik Halat's response to the Tax Appendix was deficient, but Celik Halat correctly explained that the GIIS Customs Duty Exemption had no impact on Celik Halat's taxes.[188] The Tax Program Appendix does not mention duties but rather asks about taxes and tax losses. Celik Halat believes it provided an accurate response to the question.[189] Because of the short time involved, Celik Halat had to limit itself to answering the questions Commerce asked, and Commerce did not mention duty rates, duty amounts, or engineering specifications regarding wire rope machinery.[190]

---

[184] *Id.*
[185] *Id.*
[186] *Id.* at 8 (citing Celik Halat's SQR at 2 and Exhibit 26).
[187] *Id.*
[188] *Id.* at 9 (citing Celik Halat's SQR at Exhibit 26).
[189] *Id.* at 9.
[190] *Id.*

Commerce also failed to provide Celik Halat an opportunity to remedy a deficiency before resorting to AFA as required by section 782(d) of the Act.[191]  Moreover, Commerce could have sought the information at verification but failed to do so.[192]

- Celik Halat certified that the equipment at issue could not be used to produce PC strand. Therefore, any duty rates or how much duty was forgone is immaterial.  While Commerce is not required to verify every item in the questionnaire responses, there is an underlying assumption that, if Commerce chooses not to verify, then the facts not verified must be accepted as true if there are no other facts presented to the contrary.[193]

- Celik Halat and the GOT both provided certified statements to Commerce that the equipment could not be used for PC strand production and the government agency and company officials stated in the letter of approval and the incentive certification and completion visa that the equipment could not be used in that manner.[194]

- Even if Celik Halat neglected to include a particular document or translation resulting in a gap in evidence, filling that gap with AFA is improper.  In addition to the admonition from the Court, Commerce should use neutral facts available on the record to determine that the relevant equipment cannot be used to produce PC Strand.[195]

- Additionally, even if Commerce were to apply an AFA rate, the rate chosen in the Draft Results is impermissibly disproportionate because the AFA rate is 45 times higher than the average rate of all other programs for which Celik Halat received a benefit and 25 times higher than the highest program rate.[196]

---

[191] *Id*.
[192] *Id*. at 9-10.
[193] *Id*. at 10.
[194] *Id*. at 11.
[195] *Id*. at 12.
[196] *Id.* at 13-14.

- Under section 776(d)(2) of the Act, Commerce must assess the circumstances of the alleged failure to cooperate before determining an AFA rate, and it cannot apply the most punitive AFA rate where there is no evidence that Celik Halat deliberately withheld or mispresented information.[197]  Given Commerce's unfair treatment of Celik Halat, Commerce should take extra care that any rate used to fill a gap is reasonable.[198]

- An appropriate neutral choice would be the average of other calculated programs or the highest of the other calculated programs, and a more appropriate AFA rate, if necessary, would be within the bounds of reasonableness, *e.g.*, double or ten times the highest calculated rate.[199]

- The AFA rate chosen by Commerce appears to be impermissible margin shopping to ensure that Celik Halat's overall subsidy rates is not *de minimis* and an abuse of discretion.[200]  Celik Halat is not receiving more than a *de minimis* level of subsidies and should be excluded from the order.

**Commerce's Position:**

Celik Halat argues that the Court directed Commerce to take its information as provided and to fill any gaps in the record with neutral facts available.  We disagree with this interpretation of the Court's instructions.  While the Court directed Commerce to calculate Celik Halat's rate without resorting to section 776 of the Act "*with respect to the filing of the response to the Initial Questionnaire,*"[201] the Court did not state that Commerce could not apply facts available or AFA under any circumstances.  Moreover, the Court referenced section 776 of the

---

[197] *Id.* at 14.
[198] *Id.* at 14-15.
[199] *Id.* at 15.
[200] *Id.* at 15-16.
[201] *See Remand Order* at 37 (emphasis added).

Act (*i.e.*, facts available and AFA) and not solely section 776(b) in its instructions, and we read this as an instruction not to apply either neutral facts available or AFA regarding Celik Halat's initial filing of the questionnaire response. Therefore, in our supplemental questionnaire, we requested that Celik Halat provide the bare minimum information to fill certain gaps in the record due to Celik Halat's failure to respond fully to section III of the initial questionnaire. We found the information provided by Celik Halat sufficient to determine whether Celik Halat received a countervailable benefit for all programs other than the GIIS Customs Duty Exemption program. As described in the "GIIS Customs Duty Exemption" program section above, we clearly directed Celik Halat to provide benefit information in both the Standard Questions Appendix and the Tax Program Appendix.

We find Celik Halat's argument that we failed to request this information without merit. Celik Halat attempts to make a distinction between "taxes" and "customs duties" regarding the questions in the Tax Program Appendix. This distinction tries to avoid the central issue: Commerce asked for benefit information both in the Standard Questions Appendix and the Tax Program Appendix. Celik Halat's response that there was no benefit because it was an exemption is not reliable. Clearly, an exemption of any sort provides a benefit in the amount not paid to the government that would otherwise be owed, whether the exemption is for a tax not paid or for duties not paid. Furthermore, a customs duty or a tariff is commonly referred to as a form of tax by governments on imported merchandise.[202] However, even if Celik Halat were confused when we sent the initial questionnaire, in our supplemental questionnaire we identified that Celik Halat's initial response was deficient and specifically instructed Celik Halat to

---

[202] *See, e.g., United States v. Shallus & Co.*, 9 Ct. Cust. 168, 171 (Ct. Cust. App. 1919) ("The definition of a duty is a 'tax on imposts; excise or customs dues.'"); *Arden v. United States*, 13 Ct. Cust. 42, *passim* (Ct. Cust. App. 1925); *United States v. Passavant*, 169 U.S. 16, *passim* (1898); and *Hylton v. United States*, 3 U.S. 171, *passim* (1796).

complete the Tax Program Appendix with respect to this program after it failed to respond to the appendix in its initial response.  Moreover, Celik Halat's argument does not explain why it failed to respond fully to our Standard Questions Appendix in response to our supplemental questionnaire after it also failed to respond to this appendix in its initial response.

Celik Halat would also have Commerce determine Celik Halat established that the benefit under this program was tied to the production of non-subject merchandise.  However, as Commerce explained in detail above, Celik Halat failed to meet its evidentiary burden.  Celik Halat relies on two evidential offerings to support its contention:  (1) the equipment lists; and (2) Celik Halat's certifications that its statements that the equipment could not be used to produce subject merchandise were accurate.  As discussed above in the "GIIS Customs Duty Exemption" program section, we continue to find Celik Halat's evidence insufficient to establish that the benefit under this program is tied to non-subject merchandise.  It is the burden of the party that claims a benefit is tied to particular merchandise to establish that tying exists.  We find that a list of equipment and a certification by company officials is insufficient to meet this burden and does not establish that the intended purpose of the subsidy at the time it was bestowed was restricted for use in the production of non-subject merchandise.  To find otherwise would shift Commerce's role as the agency that determines whether tying exists to the parties making the claim themselves, and would allow companies to merely provide unsupported statements as evidence of these claims.  Such a rule would reverse our entire body of practice related to this subject, which has been upheld by the Court.[203]  Further, we disagree that verification would have been an appropriate time to obtain this missing information from Celik Halat.  The purpose

---

[203] *See Taizhou United Imp. & Exp. Co., Ltd. v. United States*, Consol. Ct. No. 16-00009, Slip Op. 22-14 (CIT February 18, 2022); *see also Changzhou Trina Solar Energy Co. v. United States*, 352 F. Supp. 3d 1316 (CIT 2018).

of verification is to confirm the information already on the record, not to obtain new factual information.[204]

We also disagree that our application of the 2.27 percent AFA rate is unreasonable, unsupported, or a result of "margin shopping." As explained in our redetermination, we followed our standard, long-standing AFA hierarchy to select and corroborate an AFA subsidy rate for this program. While Celik Halat claims that the facts of this case would somehow warrant deviating from our normal practice, we find that Celik Halat failed to explain why its situation is so unique as to support such deviation. Here, as in many cases in which we apply AFA, we asked Celik Halat twice for information in its possession, and Celik Halat failed to provide that information. Moreover, Celik Halat does not argue that the RIIS – Tax Reduction program, from which we derived the AFA rate, is not a comparable program to the GIIS Customs Duty Exemption program. Accordingly, we continue to find that the 2.27 percent subsidy rate is an appropriate subsidy rate to apply as AFA for the GIIS Customs Duty Exemption program.

## VI.    FINAL RESULTS OF REDETERMINATION

We recalculated Celik Halat's estimated net countervailable subsidy rate according to the analysis described above. As a result, Celik Halat's estimated net countervailable subsidy rate is 2.96 percent.[205] Celik Halat's estimated net countervailable subsidy rate includes the subsidy provided under the Exemption on Exchange Tax for Foreign Exchange Transactions program as calculated in the Post-Preliminary Memorandum, which was not based on AFA in the underlying proceeding.[206] As a result of the changes to Celik Halat's subsidy rate, Commerce also revised

---

[204] *See Guizhou Tyre Co., Ltd. v. United States*, 523 F. Supp. 3d 1312, 1350 (CIT 2021) ("{V}erification is not a forum for respondents to provide or for Commerce to accept or collect new factual information.").
[205] *Id*.
[206] *See* Post-Preliminary Memorandum at 5.

the all-others rate applicable to all other producers/exporters not individually investigated to be 16.87 percent.[207]  Because Celik Halat's estimated subsidy rate calculated in these final results of redetermination is different from the estimated subsidy rate in the *Final Determination*, we intend to issue an amended final determination, should the Court sustain these final results of redetermination.

4/15/2022

X 

Signed by: LISA WANG

Lisa W. Wang
Assistant Secretary
  for Enforcement and Compliance

---

[207] *See* section 735(c)(5)(A) of the Act; *see also Preliminary Determination* PDM at 6-7 (explaining the methodology for determining the rate applied to companies not selected for individual examination), unchanged in the *Final Determination*.  We have calculated the simple average of the two responding firms' rates for the all-others rate using the following calculation:  (2.96 percent (Celik Halat's calculated rate) + 30.78 percent (Guney Celik's calculated rate))/2 = 16.87 percent (the all-others rate).  *See Final Determination*, 85 FR at 80006.